UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CARA MILLER,<br><br>                Plaintiff,<br><br>    vs.<br><br>HONKAMP KRUEGER FINANCIAL SERVICES, INC. and BLUCORA, INC.,<br><br>                Defendants.<br><br><br>HONKAMP KRUEGER FINANCIAL SERVICES, INC.,<br><br>                Third-Party Plaintiff,<br><br>    vs.<br><br>Mariner Wealth Advisors, LLC,<br><br>                Third-Party Defendant.<br><br><br>HONKAM KREUGER FINANCIAL SERVICES, INC.,<br><br>                Counter-Claimant,<br><br>    vs.<br><br>CARA MILLER,<br><br>                Counter-Defendant. | 5:20-CV-05056-KES<br><br><br>ORDER GRANTING DEFENDANT/THIRD-PARTY PLAINTIFF/COUNTER-CLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION AS TO THE COVENANT NOT TO COMPETE |

Plaintiff, Cara Miller, filed suit against defendants, Honkamp Krueger Financial Services, Inc. (HKFS) and Blucora, Inc., seeking declaratory judgment. Docket 1. She amended her complaint four days later. Docket 6. HKFS answered the amended complaint and filed a third-party complaint against Mariner Wealth Advisors, LLC and a counterclaim against Miller. Docket 7. HKFS then filed a motion for preliminary injunction, or in the alternative, temporary restraining order against Miller and Mariner. Docket 8. Miller and Mariner oppose the motion. Docket 18. The court held an evidentiary hearing on September 29-30, 2020. Docket 35.

The court orally granted HKFS's motion for preliminary injunction as to Miller's alleged breach of the parties' covenant not to compete. Docket 35 at 2. The court ordered additional briefing on the alleged breaches of the remaining covenants between the parties. For the following reasons, and those outlined in the court's oral order, the court grants HKFS's motion for preliminary injunction against Miller as to Miller's alleged breach of the parties' covenant not to compete. The court reserves ruling on the alleged breach of the remaining covenants until the parties' briefs are received.

**BACKGROUND**

HKFS is an Iowa corporation with its principal place of business in Dubuque, Iowa. Docket 6 ¶ 4. HKFS is a financial services and financial planning firm. *Id.* ¶ 11. HKFS works with CPA firms and their clients to provide financial planning services. *Id.* Blucora recently acquired HKFS as part of a

stock purchase. Docket 6 ¶ 5. Blucora is a Delaware corporation with its principal place of business in Irving, Texas. *Id.* ¶ 6.

Miller is an individual who resides in South Dakota. *Id.* ¶ 3. Miller began working for HKFS as a financial advisor in April or May of 2006. *Id.* ¶ 10. Miller lived in South Dakota and served clients based in Wyoming, South Dakota, and Colorado the entire time she worked for HKFS. *Id.* Miller worked for HKFS selling financial planning services that included fee-based investment management, commission-based investment sales, commission-based insurance sales, and retirement plan services to clients. *Id.* ¶ 12. HKFS provided training and information to Miller regarding HKFS's business model and its relationships with CPAs. Docket 7 at 24, ¶ 46.

Around January 1, 2018, Miller was promoted to the position of non-equity partner. *Id.* at 17, ¶ 28. This promotion gave Miller the ability to participate in HKFS's profit sharing program. *Id.* Around January 9, 2019, Miller was promoted to vice president of financial planning consultation. *Id.* HKFS alleges that Miller's success with HKFS was due to HKFS introducing her to CPA firms and providing her access to HKFS's resources and confidential information that was necessary to solicit CPA firms and CPA firms' clients. *Id.* at 24-25, ¶ 48.

In her role as vice president of financial planning consultation, Miller served as an account manager and relationship manager for the CPAs with whom HKFS worked. *Id.* at 18, ¶ 29. She also acted as the liaison between HKFS and the CPAs' clients to make sure the clients received successful

financial planning services. *Id.* According to HKFS, Miller had "nearly unlimited access to HKFS's trade secrets, proprietary information, and confidential information" during her employment. *Id.* at 18, ¶ 30.

On May 1, 2006, around the time Miller began working at HKFS, she and HKFS entered into an Employment Agreement. Docket 6 ¶ 13; *see* Docket 10-1. The Employment Agreement contained two negative covenants: a client non-solicitation provision and a covenant not to compete. Docket 6 ¶ 14; Docket 10-1 § 9. The non-solicitation provision in the Employment Agreement states:

> . . . [I]f this Employment Agreement is terminated by either party for any reason, [Miller] agrees not to solicit Business, nor to assist any other person in the solicitation of Business, from any Company client or prospective client, directly or indirectly, for a period of three years from and after the date of termination of employment. Furthermore, during the same three year [sic] period after termination of employment, [Miller] will not accept any Business from any of [HKFS]'s clients or prospective clients.

Docket 10-1 § 9(a).

The covenant not to compete in the Employment Agreement states:

> [Miller] further covenants that for a period of one year following the termination of [Miller's] employment for whatever reason, [Miller] will not, within [HKFS]'s market area, directly or indirectly, either as a sole proprietor, partner, stockholder, director, officer, employee, consultant or in any other capacity, conduct or engage in, or be interested in or associated with, any person or entity which engages in the "Business" (as defined [in § 9(a)]) working with CPA firms.

*Id.* § 9(b). The covenant not to compete defines HKFS's market area as "includ[ing], but not limited to, any state in which HKFS has conducted business at any time in the preceding twelve months." *Id.*

4

The Employment Agreement also contains a Confidentiality Agreement. Docket 10-1 § 8. The Employment Agreement defines confidential information as:

> . . . [I]nformation in whatever form, including information that is written, electronically stored, is of commercial value to [HKFS] and that was created, discovered, developed, or otherwise becomes known to [Miller], or in which property rights are held, assigned to, or otherwise acquired or conveyed to [HKFS], including any idea, knowledge, know-how, process, system, method, technique, research and development, technology, software, technical information, trade secret, trademark, copyrighted material, reports, records, documentation, data, customer or supplier lists, tax or financial information, business or marketing plan, strategy, or forecast. Confidential Information does not include information that is or becomes generally known within [HKFS]'s industry through no act or omission by employee provided, however, that the compilation, manipulation, or other exploitation of generally known information may constitute Confidential Information.

*Id.* § 8(a). The Employment Agreement restricts Miller's disclosure of HKFS's confidential information as follows:

> During the term of this Agreement and after, Employee shall not, without [HKFS]'s prior written consent specifically referring to this covenant, (1) use any Confidential Information for the benefit of [herself] or any other party other than [HKFS] or disclose it to any other person or entity; (2) remove any Confidential Information or other documentation, device, plan or other record or evidence pertaining to [HKFS]'s business from [HKFS]'s premises, except when specifically authorized to do so in pursuit of [HKFS]'s business, or (3) retain copies or other records of any such items.

*Id.* § 8(c). The Employment Agreement states that it "shall be governed by the laws of the State of Iowa." *Id.* § 13.

On July 25, 2016, while Miller was still employed by HKFS, Miller and HKFS entered into an Agreement Ancillary to Employment. Docket 6 ¶ 15; *see* Docket 10-3. The Ancillary Agreement contains two anti-piracy covenants.

Docket 10-3 § 2. In the first covenant, Miller agrees to not solicit or accept business from HKFS for a two-year period following the end of her employment by HKFS:

> Notwithstanding and in addition to the above, during [Miller]'s employment and for a period of two years after [she] ceases to be employed by [HKFS], [Miller] shall not, directly or indirectly, solicit, accept, or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by [HKFS], any client, account or location of [HKFS] with which [Miller] has had any contact as a result of [her] employment either before or after [July 25, 2016] by [HKFS], including clients with respect to whom [Miller] performed professional services prior to [her] employment with [HKFS].

Id. § 2(a). The second covenant restricts Miller from soliciting other HKFS employees for employment for a two-year period after she ceases to be employed by HKFS. Id. § 2(b).

The Ancillary Agreement also contains a limitation on Miller's disclosure of HKFS's confidential information:

> [Miller] covenants and agrees that [she] will not, at any time during or following the term of [her] employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to [her] as a result of [her] employment either before or after [July 25, 2016] by [HKFS]. For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value to [HKFS], including, but not be limited to, information relating to such matters as [HKFS]'s trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of [HKFS], pricing practices for [HKFS]'s services, marketing and sales practices of [HKFS], financial information relative to [HKFS], any other information which could prove beneficial in enabling a competitor to compete with [HKFS], and all other information related to [HKFS]'s Business.

> [Miller] agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to [HKFS]'s operations and business,

> whether prepared by [Miller] or not, and all objects associated therewith, including, but not limited to, access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by [HKFS], are the sole and exclusive property of [HKFS]. [Miller] shall not, except for [HKFS] use, copy or duplicate any of the aforementioned items, nor remove them from [HKFS]'s facilities, nor use any information concerning them, except for [HKFS]'s benefit, either during the term of this Agreement or thereafter. [Miller] expressly agrees to deliver all of the aforementioned items in [her] possession to [HKFS] on termination of this Agreement, or at any other time on [HKFS]'s request, together with [Miller]'s written certification of compliance.

Docket 10-3 § 1.

The Ancillary Agreement states that "[t]he construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the state of Iowa." *Id.* § 9. It also states that the obligations under the Ancillary Agreement survive termination of Miller's employment or termination of the Ancillary Agreement: "Any termination of [Miller]'s employment or this Agreement will not terminate or otherwise affect the enforceability of the obligations of [Miller] hereunder." *Id.* Finally, the agreement states that it "supersedes all prior discussions and agreements between [HKFS] and [Miller] with respect to the subject matter hereof." *Id.* The Ancillary Agreement does not mention restrictions on Miller's employment with HKFS's competitors after the termination of her employment. *See id.* It does not contain a covenant not to compete. *See id.*

On July 14, 2016, an email was sent from an individual named Teri Pitzen to a list called "All HK Companies Employees" with the subject line "updated employee handbook." Docket 39 at 48. The email states that "the Agreement Ancillary to Employee [sic] has been updated in section 2(b) Anti-Piracy Covenants to amend the period of three years to two years for non-solicitation of clients or employees from the Employer." *Id.*

On June 17, 2019, Miller and KHFS entered into an agreement titled the Employee Proprietary Information Agreement. Docket 7 at 24, ¶ 44; *see* Docket 10-4. The Proprietary Information Agreement states that Miller:

> Agree[s] to keep confidential, except as [HKFS] may otherwise consent in writing, and not to disclose, or make any use of except from the benefit of [HKFS], at any time either during or subsequent to [Miller's] employment, any trade secrets, confidential information, knowledge, data, or other information of [HKFS] relating to products, processes, know-how, designs, customer lists, business plans, marketing plans and strategies, and pricing strategies, or any subject matter pertaining to any business of [HKFS] or any of its clients, licensees, or affiliates, which [Miler] may produce, obtain, or otherwise acquire during the course of [her] employment, except as herein provided. [Miller] further agree[s] not to deliver, reproduce, or in any way allow any such trade secrets, confidential information, knowledge, data, or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of [HKFS].

Docket 10-4 § 1.

Blucora's acquisition of HKFS closed on July 1, 2020. Docket 6 ¶ 27. According to Miller, Blucora repeatedly asked her to sign a new employment agreement that contained "even more onerous non-competition provisions" than those contained in the Ancillary Agreement. *Id.* She alleges that Blucora urged her to sign the agreements by telling her that "such agreements were not

8

enforceable anyway." *Id.* But Miller never signed an employment agreement with Blucora. *Id.*

On September 4, 2020, Miller terminated her employment with HKFS. *Id.* ¶ 29. About an hour after Miller notified HKFS that she was terminating her employment, she filed this suit against HKFS and Blucora seeking a declaratory judgment that the Ancillary Agreement's non-solicitation provisions are unenforceable. Docket 7 at 26, § 52; *see* Docket 1. She filed an amended complaint on September 8, 2020, alleging that the Employment Agreement was superseded by the Ancillary Agreement and that thus, the Employment Agreement's covenant not to compete does not apply to her. Docket 7 at 26, ¶ 52; *see* Docket 6. On September 5, HKFS demanded that Miller comply with the Employment Agreement's non-solicitation provision and covenant not to compete. Docket 6 ¶ 31.

On September 7, 2020, Miller sent an email and letter to John Darrah, CEO of HKFS, stating that she was terminating the Employment Agreement. Docket 27-7 at 3. The letter states that

> "[a]lthough the enclosed Employment Agreement, dated May 1, 2006, between Honkamp Krueger Financial Services, Inc. and Cara M. Miller . . . was superseded by the Agreement Ancillary to Employment dated July 25, 2016, and, therefore, the 2006 Employment Agreement is no longer in force, to the extent it is in force, pursuant to Paragraph/Section 2 of the 2006 Employment Agreement, I am writing to provide written notice of immediate termination of this agreement.

*Id.*

The same day she resigned from HKFS, Miller began to work for Mariner. Docket 6 ¶ 30; Docket 7 at 26, ¶ 53. Mariner is a Kansas limited liability company with its principal place of business in Overland Park, Kansas. Docket 7 at 11, ¶ 3. HKFS alleges that immediately upon her resignation, Miller began contacting HKFS clients and soliciting them to leave HKFS and move their business to Mariner. Docket 7 at 26, ¶ 53. HKFS alleges that it learned Miller contacted at least two separate CPA firms to entice them from HKFS to Mariner. *Id.*

HKFS claims that Mariner is a direct competitor of HKFS. *Id.* at 27 ¶ 54. Mariner provides services and engages in business similar to HKFS's business. *Id.* Mariner provides wealth advice, tax planning and preparation, risk management services, investment management, estate planning and trust services, and specialized business services. *Id.* at 27 ¶ 55. Mariner has 40 locations throughout the United States, including offices in South Dakota and Iowa. *Id.* at 27 ¶ 56. Mariner's South Dakota office is in Rapid City, where the HKFS office that Miller worked at is located. *Id.* at 27 ¶ 57.

According to HKFS, it offers unique services that differentiate it from other financial services companies because its "business model involves strategically developing focused partnerships and relationships with CPA firms across the United States to provide wealth management services to the clients of those CPA firms." Docket 7 at 13, ¶ 13. When HKFS loses a relationship with a CPA firm, it loses business from the CPA firm's clients that have already been referred to HKFS and loses potential future referrals. *Id.* at 15, ¶ 21.

KHFS argues that the loss of these past and future opportunities is unquantifiable. *Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). To determine whether preliminary relief such as a preliminary injunction or a temporary restraining order is appropriate, the court considers the following factors: " '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on [the nonmovant]; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest.' " *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (alterations in original) (quoting *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). The *Dataphase* test for preliminary injunctive relief is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). Thus, when weighing these factors, "no single factor is in itself dispositive[.]" *Calvin Klein Cosms. Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). "[A]ll of the factors must be considered to determine" whether the balance weighs toward granting the injunction. *Id.*

**DISCUSSION**

**I.     The Probability of HKFS's Success on the Merits of its Claim that
         Miller Breached the Employment Agreement's Covenant Not to
         Compete**

The first *Dataphase* factor focuses on the probability that the movant will
succeed on the merits. "Success on the merits has been referred to as the most
important of the four factors." *Roudachevski*, 648 F.3d at 706. Probability of
success on the merits in this context means that the moving party must show
that it has "a 'fair chance of prevailing' " on the merits. *Kroupa v. Nielsen*, 731
F.3d 813, 818 (8th Cir. 2013) (quoting *Planned Parenthood Minn., N.D., S.D. v.
Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). A "fair chance of
prevailing" does not necessarily mean a greater than fifty percent likelihood of
prevailing on the merits of the claim. *Planned Parenthood*, 530 F.3d at 731-32.
Thus, "[a]t the early stage of a preliminary injunction motion, the speculative
nature of this particular inquiry militates against any wooden or mathematical
application of the test." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179
(8th Cir. 1998).

A Federal court sitting in diversity applies state substantive and federal
procedural law. *Gasperini v. Ctr. For Human., Inc.*, 518 U.S. 415, 427 (1996).
Questions of contract interpretation are substantive law questions. Thus, the
court applies South Dakota state law when interpreting the covenant not to
compete. Under South Dakota law, a court honors contractual choice of law
provisions unless they contravene South Dakota public policy. *Dunes Hosp.,
LLC v. Country Kitchen Int'l, Inc.*, 623 N.W.2d 484, 488 (S.D. 2001). The

Employment Agreement and Ancillary Agreement each contain an Iowa choice of law clause. Docket 10-1 § 13; Docket 10-3 § 9. As discussed below, application of Iowa law to the covenant not to compete provision of the contract does not contravene South Dakota public policy. Thus, the court applies Iowa law to the contracts.

### A.      Whether the Employment Agreement's covenant not to compete is superseded by the Ancillary Agreement

HKFS argues that Miller's employment by Mariner is contrary to the terms of the covenant not to compete contained in the Employment Agreement. Docket 9 at 17-20; Docket 26 at 6-15. Miller and Mariner do not argue that Miller has not violated the covenant not to compete. *See* Docket 18 at 11-14. Rather, Miller and Mariner argue that any covenants included in the Employment Agreement are unenforceable because the Employment Agreement was completely superseded by the Ancillary Agreement. *Id.*

The primary goal of contract interpretation is to "determine the parties' intentions at the time they executed the contract." *Walsh v.* Nelson, 622 N.W.2d 499, 503 (Iowa 2001). "The clearest evidence of intent comes from the language of the [agreement] itself." *Gosiger, Inc. V. Elliott Aviation, Inc.,* No. 4:13-CV-00477, 2015 WL 11070982, at*4 (S.D. Iowa March 17th, 2015) (citing *Walsh*, 622 N.W.2d at 503). The fact that two parties disagree about a term or provision does not mean that the term or provision is ambiguous. *Walsh*, 622 N.W.2d at 503. When a contract is not ambiguous, it must be enforced as written. *Spilman v. Bd. of Dirs.*, 25 N.W.2d 593, 596 (Iowa 1977).

The plain language of the Ancillary Agreement states that it "supersedes all prior discussions and agreements between [HKFS] and [Miller] *with respect to the subject matter hereof.*" Docket 10-3 § 9 (emphasis added). Thus, the Ancillary Agreement is unambiguous in that it only supersedes agreements that are discussed in the Ancillary Agreement—not all prior agreements between the parties.

The Ancillary Agreement contains a non-disclosure agreement and two anti-piracy covenants: a covenant not to solicit HKFS's business and a covenant not to solicit HKFS's employees. *Id.* §§ 1, 2. The anti-piracy covenants each last for two years following Miller's employment with HKFS. *Id.* § 2. The Ancillary Agreement does not contain a covenant not to compete or any promise that Miller will not be employed by HKFS's competitors after leaving HKFS. *See id.* The only mention of competition or competitors in the agreement is in the non-disclosure agreement's definition of "confidential information." *Id.* § 1.

The Employment Agreement is another agreement between the parties to the Ancillary Agreement, HKFS and Miller. It contains a non-solicitation provision that lasts for a period of three years. Docket 10-1 § 9(a). It also contains a covenant not to compete that restricts Miller's ability to work for HKFS's competitors for a period of one year after her employment with HKFS terminates. *Id.* § 9(b). There are numerous other subjects in the Employment Agreement that are not discussed in the Ancillary Agreement, including fringe

14

benefits, facilities, and compensation, in addition to the covenant not to compete. *See id.*

Under the plain language of the Ancillary Agreement, the agreements that are discussed in the Employment Agreement but are not discussed or modified in the Ancillary Agreement survive the Ancillary Agreement and are not extinguished by the integration clause. The covenant not to compete is contained in the Employment Agreement but is not altered or discussed in the Ancillary Agreement. Thus, the covenant not to compete survives the Ancillary Agreement's integration clause and may be enforced against Miller.

The facts here are like those in *Hot Stuff Foods, LLC v. Mean Gene's Enter. Inc.*, a persuasive case interpreting South Dakota law. 468 F. Supp. 2d 1078, 1100 (D.S.D. 2006). There, a plaintiff sought to enjoin a former employee from violating the terms of a covenant not to compete that the employee signed while employed by the plaintiff. *Id.* The employee, like Miller, argued that the contract containing the covenant not to compete was superseded and replaced by a separation agreement that the employee signed later. *Id.* The separation agreement stated that the agreement "supersedes and replaces . . . all prior agreements proposed or otherwise, whether written or oral, concerning the subject matter hereof." *Id.* The court held that the integration clause was limited to the terms of the severance agreement and thus did *not* supersede the covenant not to compete, because the severance agreement did not discuss the covenant not to compete. *Id.* at 1101. The facts in *Hot Stuff Foods* are similar to those here. The later-signed agreement, the Ancillary Agreement, does not

address the covenant not to compete contained in the Employment Agreement. Thus, the integration clause of the Ancillary Agreement does not apply to the covenant not to compete in the Employment Agreement and it is still in effect. Even if South Dakota law applies, like Miller argues, the covenant not to compete was not superseded by the Ancillary Agreement.

The court is also persuaded by the email that was sent to all HKFS employees on July 14, 2016, 11 days before the Ancillary Agreement was entered into by HKFS and Miller. Docket 39 at 48. That email stated that the anti-piracy covenants were amended from a period of three years to two years for non-solicitation of clients or employees from HKFS. *Id.* It also states that "many policies have been amended." *Id.* This suggests that the Ancillary Agreement was not intended to completely supersede the Employment Agreement; rather, it was intended to modify certain terms in the Employment Agreement. Thus, those terms present in the Employment Agreement but not modified or discussed in the Ancillary Agreement remain part of the parties' agreements. The covenant not to compete, one such term, remains enforceable against Miller.

### B.   Whether Miller's termination of the Employment Agreement after she began working for Mariner terminates her obligations under the covenant not to compete

Miller argues that she terminated the Employment Agreement after ending her employment with HKFS, and thus, the agreement is terminated and may not be enforced. Docket 18 at 13-14. She references the email and letter sent to Darrah on September 7, 2020 that states that she is terminating the

16

Employment Agreement. Docket 27-7 at 3. Miller argues that this letter terminates any obligations she has under the covenant not to compete.

The court disagrees for two reasons. First Miller accepted and began employment with HKFS on September 4, 2020, before she alleges that she terminated the agreement via the September 7, 2020 letter. Thus, she violated the non-compete when she accepted employment with Mariner prior to terminating the contract.

Second, even if Miller had accepted employment after the alleged termination of the covenant not to compete, the covenant would be enforceable against her. The Employment Agreement states that that her obligations under the covenant not to compete extend "for a period of one year following the termination of [Miller]'s employment[.]" Docket 10-1 § 9(b). The agreement itself is for Miller's employment with HKFS, and states that "[HKFS] hereby employs [Miller] and [Miller] hereby accepts employment with [HKFS] upon the terms and conditions hereinafter set forth." *Id.* § 1. The obligations under the covenant not to compete are designed to survive termination of the contract, because when Miller's employment ends, the contract ends, too. The covenant not to compete, by its terms, extends for one year following termination of the agreement between the parties. Thus, the non-competition provision extends from one year from September 4, 2020, the date that Miller ended her employment with HKFS.

C. **Whether HKFS is Likely to Succeed on a Showing that Miller Violated the Covenant Not to Compete**

HKFS must demonstrate its likelihood of success on the merits of its claim that Miller breached the covenant not to compete of the Employment Agreement. A breach of contract claim requires "(1) an enforceable promise; (2) a breach of the promise; [and] (3) resulting damages." *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). HKFS claims that when Miller signed her employment agreement, she promised not to compete for one year following termination of her employment with HKFS.

"The general rule in Iowa is that [courts] will enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983). In determining whether a covenant is enforceable, Iowa courts look to "the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained." *Am. Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 829 (N.D. Iowa 2005) (quoting *Iowa Glass Depot*, 338 N.W.2d at 382). HKFS has shown that it has a substantial interest in protecting its goodwill and confidential information via a covenant not to compete. Like the employee in *American Express*, where the court upheld a covenant not to compete, Miller was working closely with customers and she was exposed to a great deal of

18

confidential financial information.  Further, the restriction is a reasonable restraint as it only limits Miller from competing for one year within the geographic area where HKFS does business. *Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449-50 (Iowa Ct. App. 1992) (recognizing that two- to three-year covenants not to compete are generally valid under Iowa law).

A covenant not to compete like the one at issue here is not against South Dakota public policy. A covenant not to compete is, generally, an unlawful restraint on trade in South Dakota. *McKie Ford Lincoln, Inc. v. Hanna*, 907 N.W.2d 795, 799 (S.D. 2018). But South Dakota state law allows non-compete agreements when an employee agrees to not engage in the same business or profession as an employer for two or fewer years following the employee's termination. SDCL § 53-9-11. Here, Miller agreed to not compete with HKFS for one year following her termination. Docket 10-1. Thus, the covenant not to compete is likely enforceable under South Dakota law. HKFS can show a valid promise for its breach of contract claim under both Iowa and South Dakota law.

HKFS alleges that Miller breached the non-competition agreement by accepting employment with Mariner within a year of termination of her employment with HKFS. The parties do not dispute that Mariner directly competes with HKFS and that Miller accepted employment with Mariner within a year after termination of her employment with HKFS. Thus, HKFS is likely to succeed in showing that Miller breached a valid promise.

Finally, HKFS is likely to succeed in showing that it has suffered and will continue to suffer damages. KHFS has alleged that several clients have already transferred their assets to Mariner after Miller began working there. HKFS is likely to succeed in showing that it has lost clients and has suffered damages as a result of Miller's breach of the covenant not to compete. Thus, HKFS is likely to succeed on the merits of its claim that Miller violated the covenant not to compete.

## II.     Threat of Irreparable Harm

Under the second *Dataphase* factor, the movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A movant's failure to demonstrate irreparable harm is sufficient to deny a motion for preliminary injunction. *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (citing *Watkins Inc.*, 346 F.3d at 844). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quotation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

"Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737,

741 (8th Cir. 2002); s*ee also Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d

784, 789-90 (8th Cir. 2010) ("We have previously held that a district court did

not err when finding that a loss of goodwill among customers was sufficient to

establish a threat of irreparable harm."); *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d

622, 625 (8th Cir. 1987) (finding irreparable harm where "intangible assets

such as reputation and goodwill" are at risk).

Here, HKFS has alleged that it has suffered and will likely continue to

suffer harm to its goodwill and reputation as a result of Miller's move.

Numerous clients and at least one CPA firm have already moved their

relationships from HKFS to Mariner. The CPA firms are not likely to have the

same goodwill toward HKFS and are not likely to refer their clients to HKFS

following Miller's move to Mariner. Thus, HKFS showed it is likely to suffer a

loss of goodwill sufficient to establish irreparable injury under the *Dataphase*

factors.

## III.    Balance of the Hardships

The third *Dataphase* factor for obtaining a preliminary injunction

requires the moving party to establish that its irreparable harm is greater than

the hardship that a preliminary injunction would cause the opposing party.

*Sturgis Area Chamber of Com. v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d

1090, 1101 (D.S.D. 2000).

Any harm that Miller or Mariner might face is the result of Miller's

breach of the contract with HKFS. *See Perfetti Van Melle USA v. Midwest*

*Processing, LLC*, 135 F. Supp. 3d 1015, 1020 (D.S.D. 2015) (finding that a

defendant's harm was minor when it only deprived the defendants of "further profit that they [were] not entitled to make[.]"). Thus, the harms to HKFS in the absence of a preliminary injunction outweigh those Miller and Mariner stand to suffer if the injunction is issued.

## IV.   Public Interest

The public interest is the final *Dataphase* factor the court must balance in determining whether a preliminary injunction should be issued. Here, the public interest weighs in favor of protecting proprietary information and trade secrets and enforcing legal non-compete agreements. Iowa and South Dakota law authorizes non-compete agreements like the one between HKFS and Miller. Thus, public policy favors granting the injunction here.

## V.   Bond

The Federal Rules of Civil Procedure require that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Both parties agree that a bond in the amount of $350,000 is adequate to meet the requirements of Rule 65(c).

## CONCLUSION

HKFS showed that the covenant not to compete between Miller and HKFS is valid and enforceable and that it is not superseded by the Ancillary Agreement. Further, HKFS is likely to succeed on the merits of its claim that Miller breached the agreement, it faces irreparable harm from Miller's breach

22

and threat of continued breach, it showed that the balance of harms are in its favor, and it showed that public policy favors granting the injunction against Miller's breach of the covenant not to compete. Thus it is

ORDERED that Miller is enjoined from taking action of any character that results in violation of or interference with the non-competition provisions of the Employment Agreement, including, but not limited to, continued employment with Mariner, or any of its subsidiaries, parents, or other related entities, for the period of time as defined in the Employment Agreement.

IT IS FURTHER ORDERED that HKFS must post a bond in the amount of $350,000 as required by Fed. R. Civ. P. 65(c).

Dated October 2, 2020.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

23