UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CARA MILLER,<br><br>    Plaintiff,<br><br> vs.<br><br>HONKAMP KRUEGER FINANCIAL SERVICES, INC. and BLUCORA, INC.,<br><br>    Defendants.<br><br><br>HONKAMP KRUEGER FINANCIAL SERVICES, INC.,<br><br>    Third-Party Plaintiff,<br><br> vs.<br><br>MARINER WEALTH ADVISORS, LLC,<br><br>    Third-Party Defendant.<br><br><br>HONKAM KREUGER FINANCIAL SERVICES, INC.,<br><br>    Counter-Claimant,<br><br> vs.<br><br>CARA MILLER,<br><br>    Counter-Defendant. | 5:20-CV-05056-KES<br><br><br>ORDER GRANTING DEFENDANT/THIRD-PARTY PLAINTIFF/COUNTER-CLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION AS TO THE COVENANT NOT TO COMPETE |

Plaintiff, Cara Miller, filed suit against defendants, Honkamp Krueger Financial Services, Inc. (HKFS) and Blucora, Inc., seeking declaratory judgment. Docket 1. She amended her complaint four days later. Docket 6. HKFS answered the amended complaint and filed a third-party complaint against Mariner Wealth Advisors, LLC, and a counterclaim against Miller. Docket 7. HKFS then filed a motion for preliminary injunction, or in the alternative, temporary restraining order against Miller and Mariner. Docket 8. Miller and Mariner oppose the motion. Docket 18.

The court held an evidentiary hearing on September 29-30, 2020. Docket 35; *see* Dockets 50, 50-1. The court orally granted and issued a written order on HKFS's motion for preliminary injunction as to Miller's alleged breach of the parties' covenant not to compete. Docket 35 at 2. The court ordered additional briefing on the alleged breaches of the remaining covenants between the parties. The parties filed supplemental briefs and reply briefs regarding the parties' non-solicitation agreement. Dockets 52, 53, 57, 58. For the following reasons, the court grants in part HKFS's motion for preliminary injunction against Miller as to Miller's alleged breach of the parties' non-solicitation agreement.

**BACKGROUND**

The court included a thorough factual background on the parties' relationship and the Employment Agreement in its order granting preliminary injunction as to the covenant not to compete. Docket 44 at 2-11. The court

incorporates those facts here and lays out the following facts relevant to the parties' non-solicitation agreement:

## I.     HKFS's Relationship with CPA Firms

Brian Cose, HKFS's chief client development officer, testified that CPA firms play an important role in HKFS's business model. Docket 50 at 6, 9. Cose described the relationship between HKFS and its CPA firms as a "professional referral relationship." *Id.* Cose described a complex process that HKFS teaches CPA firms in order to help the firms better market financial planning to their clients. *Id.* at 11. Cose stated that the process that HKFS uses to engage with CPA firms is a "cornerstone of what gives [HKFS] a niche" in the financial planning market. *Id.* at 12.

Cose testified that financial planning consultants like Miller coach CPA firms and help them learn how to teach the firms' clients about financial planning. *Id.* at 13. Cose stated that HKFS uses "client development specialists" who meet with CPA firms, discuss particular clients with the firms, and then work to persuade the CPA firms' clients to become clients of HKFS. *Id.* at 19. According to Cose, those individuals allow financial planning consultants, like Miller, to focus on "taking care of existing clients and making sure the CPA is growing and developing relationships." *Id.* at 19-20.

Cose stated that HKFS views CPAs as clients. *Id.* at 20. He testified that internally at HKFS, while CPAs are sometimes referred to as CPA affiliates, "they are clients." *Id.* at 20-21. HKFS shares revenue with CPA firms based on the value of the accounts that convert from being clients of the CPAs to being

HKFS's clients. *Id.* at 22. HKFS charges its clients a fee for asset management. *Id.* at 23. Throughout his testimony, Cose generally referred to CPAs as "CPAs" or "CPA firms" and referred to the CPA firms' clients, who might later become HKFS's clients, as "clients" or "CPA clients." *See id.* at 6-179.

During her testimony, Miller referred to "CPA firms" and "clients" as separate entities. *See id.* at 193 ("I brought clients with, but not CPA firms."). She also testified that her role in building relationships with CPA firms was separate from her role developing relationships with end clients. *Id.* at 196. Miller stated that until 2018, when she became a non-equity partner of HKFS, her compensation was tied to how many end clients and how much revenue from those clients she brought in, not her relationships with CPA firms. *Id.* Nonetheless, she stated that having a trusted relationship with CPA firms was an important part of her role because it led to the CPA firms introducing end clients to Miller and HKFS. *Id.* at 197-98. The majority of Miller's book of business while at HKFS came from clients of CPA firms with whom Miller worked. *Id.* at 197. Miller testified that while she worked at HKFS, her offices were located inside two different CPA firms. *Id.* at 202.

HKFS introduced as evidence at the hearing the position description for Vice President, Financial Planning Consultant—Miller's role when she left HKFS. Docket 39 at 27-29; Docket 50 at 199-200. The description's summary states:

> The Financial Planning Consultant (FPC) will serve as an account manager and as a relationship manager for CPAs affiliated with HKFS. The FPC will also act as liaison between HKFS and CPA

> clients to facilitate successful financial service practices for all HKFS clients, thus procuring business for HKFS, including gathering assets and selling insurance.

Docket 39 at 27. The description also states that the FPC will develop financial services business "for CPA client firms," "[t]rain CPAs," "[d]evelop plans with CPAs," "attend meetings with clients and CPAs," "[d]evelop Investment Policy Statement with CPAs and clients," "[e]nsure CPAs provide timely and accurate follow-up with clients," "[p]rovide reports to clients, CPAs and HKFS," and "provide financial plans and products to prospects and existing clients." *Id.*

## II.   Miller's Contact with HKFS Clients and HKFS CPA Firms after Leaving HKFS

Miller terminated her employment with HKFS on September 4, 2020. Docket 6 ¶ 29. The parties dispute the level of contact Miller had with several specific HKFS clients following her departure from HKFS. *See* Docket 52 at 7-17; Docket 53 at 3-9, 20-23; Docket 57 at 8-12; Docket 58 at 1-6. The facts relating to each client at issue are as follows:

### A.   DeAnn Morgan CPA Firm

Miller testified during the hearing that she called DeAnn Morgan, a CPA with whom she worked while she was employed by HKFS, to let Morgan know that Miller departed from HKFS. Docket 50-1 at 18. Miller stated that she contacted Morgan on September 4, 2020, as a professional courtesy. *Id.* Miller was not, according to her testimony, trying to "persuade" Morgan or "get [her] to come with [her]." *Id.* Miller stated that Morgan decided "[a]lmost immediately" that she wanted to maintain her relationship with Miller. *Id.*

Miller testified that she told Morgan that she could ask someone from Mariner to contact Morgan to share more information about Mariner. *Id.* at 39-40. She testified that she then asked Jim Siemonsma, a former HKFS employee who moved to Mariner in 2018, to contact Morgan. *Id.* at 40. Miller stated that she did not contact Morgan, or any of the CPAs she notified of her departure from HKFS, in order to try to continue a relationship with them at Mariner or to have access to their clients. *Id.* at 19.

### B.    Casey Peterson CPA Firm

Miller testified that she called Kevin Eggebraaten, an employee of the Casey Peterson CPA firm, to tell him she had resigned from HKFS. Docket 50-1 at 38. Miller stated that Eggebraaten asked her why she left HKFS, but that she did not remember if she told Eggebraaten why she left. *Id.* at 38-39. She testified that he was very upset when he learned she resigned from HKFS. *Id.* at 38. Miller told Eggebraaten during the same conversation that she was going to work for Mariner. *Id.* at 39. Miller also testified that she told Eggebraaten that she could have someone from Mariner reach out to him to tell him more about Mariner, but that she could not talk to him about Mariner. *Id.* at 39. She then told Siemonsma that while she thought Eggebraaton had questions, it was not a good idea for Siemonsma to contact him because she did not believe that Eggebraaten or others at Casey Peterson CPA firm wanted someone from Mariner to reach out. *Id.* at 41. Rather, she suggested that Siemonsma leave a message for Eggebraaten over the weekend so that Eggebraaeten could choose whether to call him back. *Id.*

### C.    End Clients Stan and Jody Wolfe

Stan and Jody Wolfe were clients managed by Miller at HKFS. *See* Docket 50 at 218. On September 5, 2020, the day after Miller left HKFS, DeAnn Morgan forwarded an email from Jody Wolfe, at the email address alphawolfe@vcn.com, to Miller's HKFS email address. Docket 39 at 32. The email from Wolfe to Morgan stated: "We just got the email regarding Cara. Do you have any time to talk over the weekend[?] If you are tied up that is fine[.] [W]e can always talk next week as well[.]" *Id.* Morgan forwarded the email to Miller's HKFS email address with a message that stated: "We will need to call Stan tmoro [sic] as well." *Id.* "Stan" refers to Stan Wolfe, Jody Wolfe's husband. *See* Docket 50 at 218. Cose testified that he was unsure whether the Jody Wolfe's email mention of an "email regarding Cara" referred to an email from HKFS about Miller or an email from Miller to the Wolfes. *Id.* at 97.

### D.    End Client Rex Brown

Rex Brown is a former HKFS client who moved his account to Mariner after Miller began employment with Mariner. Docket 50-1 at 70. Miller testified that she called Brown shortly after resigning from HKFS. *Id.* According to Miller, she told Brown "some reasons" why she left HKFS, but only after he stated that he wanted to transfer his account to Mariner. *Id.* at 71. Miller testified that she gave him the name of "Mariner Wealth Advisors," but no other information. *Id.* at 72. Miller testified that her notes of the conversation indicated that Brown told her that regardless of where Miller chose to work, Brown would move his accounts with her because he trusted her to "pick a

7

good place." *Id.* at 73. Miller testified that she did not give Brown any information about Mariner or about the reasons she was unhappy with Blucora's acquisition of HKFS. *Id.* at 74. When pressed, Miller stated that Brown may have asked for information about why she left HKFS, but that she could not remember. *Id.* She testified that she did not ask or urge Brown to transfer his account to Mariner. *Id.* at 103.

HKFS introduced as evidence at the hearing an email dated September 22, 2020, from Tom Jasiak, an employee of the Casey Peterson CPA firm, to Eggebraaten and Molly Nelson, an HKFS employee. Docket 39 at 44. The email stated that Jasiak had spoken to Brown and that Brown had decided to move his investments with Miller to Mariner. *Id.* The email states that Brown informed Jesiak that Miller "called him two or three weeks ago" to "inform him she would be leaving" HKFS. *Id.*

### E. End Client Jo Hoffman

In a September 11, 2020 voicemail, Jo Hoffman, a HKFS client as of the hearing, left a voicemail for Eggebraaten stating that she received his message the previous day. Docket 38 at 40; Docket 39 at 46. The voicemail stated that Hoffman did not "know what [Eggebraaten] want[ed] to talk to [her] about," but that she had decided to "stay with [Miller], whatever company she's going with." Docket 38 at 40. On September 21, 2020, Hoffman left a second voicemail for Eggebraaten. Docket 38 at 41; Docket 39 at 47. In that voicemail, Hoffman stated that "Cara called [her] to set up a meeting about . . . this new company that she's with." Docket 38 at 41. Hoffman stated that the "gist of the

8

conversation" between her and Miller was that they were going to have a meeting. *Id.*

Miller testified that she contacted Hoffman to inform her that she no longer worked at HKFS. Docket 50-1 at 60. Hoffman then told Miller that she would like to move her account to the firm where Miller was going to work. *Id.* According to Miller, Miller and Hoffman discussed the process of how to transfer Hoffman's account. *Id.* Miller then contacted Hoffman to set up an appointment. *Id.* At the time of the hearing, Miller and Hoffman had not yet met to discuss moving Hoffman's account to Mariner. *Id.*

### F.    Other Clients and CPA Firms

HKFS alleges that Miller contacted Tom Dosen, an employee of Wipfli Bauerly, a former CPA firm of HKFS. Docket 50 at 169-70. HKFS agrees that while Wipfli Bauerly is no longer an HKFS client, it is because they are starting their own internal wealth advisory practice, not because Miller solicited them to Mariner. *Id.* at 156.

Miller testified that she did not ask any HKFS clients to move their business to Mariner. Docket 50-1 at 105. Miller testified that "[m]ost clients" who reached out to her after she left HKFS told her that they had been contacted by HKFS to notify them that Miller had left HKFS. Docket 50 at 214. She also called some clients to tell them that she had resigned from HKFS. *Id.* at 215. She provided some clients with her contact information. *Id.* at 217. Miller testified that she is currently doing business with some of the same

clients with whom she did business while she was employed at HKFS. *Id.* at 181.

## III.    **The Ancillary Agreement**

On July 25, 2016, while Miller was still employed by HKFS, Miller and HKFS entered into an Agreement Ancillary to Employment. Docket 6 ¶ 15; *see* Docket 10-3. The Ancillary Agreement contains two anti-piracy covenants. Docket 10-3 ¶ 2. In the first covenant, Miller agrees to not solicit or accept business from HKFS for a two-year period following the end of her employment by HKFS:

> Notwithstanding and in addition to the above, during [Miller]'s employment and for a period of two years after [she] ceases to be employed by [HKFS], [Miller] shall not, directly or indirectly, solicit, accept or divert business from, provide, or attempt to convert to other methods of using, the same or similar products or services provided by [HKFS], any client, account or location of [HKFS] with which [Miller] has had any contact as a result of [her] employment either before or after [July 25, 2016] by [HKFS], including clients with respect to whom [Miller] performed professional services prior to [her] employment with [HKFS].

*Id.* ¶ 2(a). The second covenant restricts Miller from soliciting other HKFS employees for employment for a two-year period after she ceases to be employed by HKFS. *Id.* ¶ 2(b).

The Ancillary Agreement also contains a limitation on Miller's disclosure of HKFS's confidential information:

> [Miller] covenants and agrees that [she] will not, at any time during or following the term of [her] employment, directly or indirectly, divulge or disclose for any purpose whatsoever any "confidential information" that has been obtained by or disclosed to [her] as a result of [her] employment either before or after [July 25, 2016] by [HKFS]. For purposes of this paragraph, "confidential information" is such information that has a special and unique nature and value

10

to [HKFS], including but not be limited to, information relating to such matters as [HKFS]'s trade secrets, systems, procedures, manuals, confidential reports, the identity of past or present customers and clients of [HKFS], pricing practices for [HKFS]'s services, marketing and sales practices of HKFS, financial information relative to [HKFS], and any other information which could prove beneficial in enabling a competitor to compete with [HKFS], and all other information related to [HKFS]'s Business.

[Miller] agrees and covenants that all client lists, client records or data, memoranda, notes, records, papers or other documents and all copies thereof relating to [HKFS]'s operations and business, whether prepared by [Miller] or not, and all objects associated therewith, including, but not limited to, access keys, program printouts, customer lists, customer records or data, procedures, agreements, software programs, forms, documents and objects concerning any procedures or services produced, provided, developed or considered by [HKFS], are the sole and exclusive property of [HKFS]. [Miller] shall not, except for [HKFS] use, copy or duplicate any of the aforementioned items, nor remove them from [HKFS]'s facilities, nor use any information concerning them, except for [HKFS]'s benefit, either during the term of this Agreement or thereafter. [Miller] expressly agrees to deliver all of the aforementioned items in [her] possession to [HKFS] on termination of this Agreement, or at any other time on [HKFS]'s request, together with [Miller]'s written certification of compliance.

*Id.* ¶ 1.

The Ancillary Agreement states that "[t]he construction and interpretation of this Agreement shall at all times and in all respects be governed by the laws of the state of Iowa." *Id.* ¶ 9. It also states that the obligations under the Ancillary Agreement survive termination of Miller's employment or termination of the Ancillary Agreement: "Any termination of [Miller]'s employment or this Agreement will not terminate or otherwise affect the enforceability of the obligations of [Miller] hereunder." *Id.* Finally, the agreement states that it "supersedes all prior discussions and agreements between [HKFS] and [Miller] with respect to the subject matter hereof." *Id.*

The Ancillary Agreement does not contain a definition of the term
"client." *See id.* at 1-4. The Employment Agreement, executed by Miller and
HKFS before the Ancillary Agreement, contains a definition of "client" in its
non-solicitation provision. Docket 10-1 ¶ 9(a). It states: " 'Client' includes any
person, including but not limited to, an individual, corporation, partnership or
other entity with whom [HKFS] or any of [HKFS's] soliciting agents or
employees have done business within one year prior to [Miller's] termination."
*Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy and the burden of
establishing the propriety of an injunction is on the movant." *Roudachevski v.
All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Watkins, Inc.
v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). To determine whether preliminary
relief such as a preliminary injunction or a temporary restraining order is
appropriate, the court considers the following factors: " '(1) the threat of
irreparable harm to the movant; (2) the state of the balance between this harm
and the injury that granting the injunction will inflict on [the nonmovant]; (3)
the probability that [the] movant will succeed on the merits; and (4) the public
interest.' " *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir.
2019) (alterations in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109, 113 (8th Cir. 1981)). The *Dataphase* test for preliminary
injunctive relief is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed
Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). Thus, when weighing

these factors, "no single factor is in itself dispositive[.]" *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). "[A]ll of the factors must be considered to determine" whether the balance weighs toward granting the injunction. *Id.*

**DISCUSSION**

## I.   The Probability of HKFS's Success on the Merits of its Claim that Miller Breached the Ancillary Agreement's Non-Solicitation Provision

The first *Dataphase* factor focuses on the probability that the movant will succeed on the merits. "Success on the merits has been referred to as the most important of the four factors." *Roudachevski*, 648 F.3d at 706. Probability of success on the merits in this context means that the moving party must show that it has "a 'fair chance of prevailing' " on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008)). A "fair chance of prevailing" does not necessarily mean a greater than fifty percent likelihood of prevailing on the merits of the claim. *Planned Parenthood*, 530 F.3d at 731-32. And a court determining a party's likelihood of prevailing on the merits does not decide whether the party will actually win. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991). Thus, "[a]t the early stage of a preliminary injunction motion, the speculative nature of this particular inquiry militates against any wooden or mathematical application of the test." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

A federal court sitting in diversity applies state substantive and federal procedural law. *Gasperini v. Ctr. for Human., Inc.*, 518 U.S. 415, 427 (1996). Questions of contract interpretation are substantive law questions. *See, e.g.*, *Gosiger, Inc. v. Elliott Aviation, Inc.*, 2015 WL 11070982 (S.D. Iowa Mar. 17, 2015). Thus, the court applies South Dakota state law when interpreting the covenant not to compete. Under South Dakota law, a court honors contractual choice of law provisions unless they contravene South Dakota public policy. *Dunes Hosp., LLC v. Country Kitchen Int'l, Inc.*, 623 N.W.2d 484, 488 (S.D. 2001). The Employment Agreement and Ancillary Agreement each contain an Iowa choice of law clause. Docket 10-1 ¶ 13; Docket 10-3 ¶ 9. Because application of Iowa law to the contracts does not contravene South Dakota public policy, the court applies Iowa law to the contracts.

### A.    Whether the Non-Solicitation Provision Restricts Miller from Doing Business with HKFS's CPA Partners

The primary goal of contract interpretation is to "determine the parties' intentions at the time they executed the contract." *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). "The clearest evidence of intent comes from the language of the [agreement] itself . . . ." *Gosiger, Inc.*, 2015 WL 11070982 (citing *Walsh*, 622 N.W.2d at 503). When a contract is not ambiguous, it must be enforced as written. *Spilman v. Bd. of Dir. of Davis Cnty. Cmty. Sch. Dist.*, 253 N.W.2d 593, 596 (Iowa 1977). If an ambiguity is identified, the court must choose among possible meanings. *Walsh*, 622 N.W.2d at 503. Such a determination should be made "in the light of all the relevant evidence of the situation and relations of

14

the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.* (quoting Restatement (Second) of Contracts § 202 cmt. b (Am. Law Inst. 1981)).

The Ancillary Agreement states only that Miller may not solicit "clients" with whom she had contact as a result of her employment with HKFS. Docket 10-3 ¶ 2(a). The parties dispute whether CPA firm partners of HKFS are HKFS's "clients" under the non-solicitation agreement. Docket 52 at 6-7; Docket 53 at 13-18; Docket 57 at 4-7. Both HKFS and Miller acknowledge that CPA firms are an important part of HKFS's business model and that Miller's role at HKFS involved both end clients and CPAs. *See* Docket 50 at 19-20, 196. Thus, whether the Ancillary Agreement refers to both CPA firms and end clients, or whether the agreement refers to only end clients, is ambiguous.

The court turns to "relevant evidence of the situation and relation of the parties" to determine the meaning of the term "client." *Walsh*, 622 N.W.2d at 503 (quoting Restatement (Second) of Contracts § 202 cmt. b). HKFS introduced the position description for Miller's position within HKFS during the hearing. Docket 39 at 27-39. That document mentions both "clients" and "CPA firms" numerous times. *Id.* The description notes that the financial planning consultant will service business "for CPA client firms," "[t]rain CPAs," "[d]evelop plans with CPAs," "attend meetings with clients and CPAs," "[d]evelop Investment Policy Statement with CPAs and clients," "[e]nsure CPAs provide timely and accurate follow-up with clients," "[p]rovide reports to clients, CPAs

15

and HKFS," and "provide financial plans and products to prospects and existing clients." *Id.* at 27. The description states that the FPC will primarily serve as a relationship manager for "CPAs affiliated with HKFS" and "act as a liason between HKFS and CPA clients." *Id.*

The text of the position description shows that HKFS referred to CPA firms as "CPAs," or on one occasion as "CPA client firms." The description does not support an assertion that HKFS routinely used the term "client" to describe both end clients and CPA firms. The description's use of the phrase "CPAs affiliated with HKFS" in describing CPAs' relationships with HKFS also suggests that HKFS considers CPA firms to be affiliates or partners—not clients.

The Employment Agreement between the parties offers additional evidence about what the parties understood "client" to mean. There, Miller's duties are described as including meeting with "clients of [HKFS]" and being a support role for "clients of any Financial Service Providers (accountants or accounting firms, insurance agents or firms, financial planners and other Financial Service Providers)." Docket 10-1 ¶ 5. The Employment Agreement also contains its own non-solicitation agreement that states Miller may not solicit "clients or prospective clients" of HKFS. *Id.* ¶ 9(a). "Client" is defined as "any person, including but not limited to, an individual, corporation, partnership or other entity with whom [HKFS] or any of [HKFS's] soliciting agents or employees have done business within one year prior to [Miller's] termination." *Id.* ¶ 9(b).

16

These two different uses of the term "client"—the first, differentiating between "clients" and "accountants or accounting firms" with whom HKFS works, and the second, defining "client" broadly as "any person . . . with whom [HKFS] . . . [has] done business"—contradict one another. The Employment Agreement thus does not offer meaningful insight into how the term "client" was actually understood by the parties.

Finally, the court looks to Cose and Miller's testimony during the hearing as evidence of how the parties understood the term "client." Cose stated that HKFS views CPAs as clients. *Id.* at 20. He testified that internally at HKFS, while CPAs are sometimes referred to as CPA affiliates, "they are clients." *Id.* at 20-21. HKFS shares revenue with CPA firms based on the business brought to HKFS from the CPA firms' clients. *Id.* at 22. HKFS charges its own clients a fee for asset management. *Id.* at 23. Throughout his testimony, Cose referred to CPAs as "CPAs" or "CPA firms" and referred to the CPA firms' clients, who might later become HKFS's clients, as "clients" or "CPA clients." *Id.* at 6-179.

Cose's testimony shows that while CPA firms are an integral part of HKFS's business model, they are not its clients. HKFS does not collect money from CPAs in exchange for a service, as it does with its clients. HKFS partners with CPAs for access to the CPAs' clients and shares revenue with the CPAs based on the value of the CPA clients' accounts if they become HKFS clients. While Cose asserts CPAs are clients, his own testimony does not support that conclusion.

During her testimony, Miller referred to "CPA firms" and "clients" as separate entities. *See id.* at 193 ("I brought clients with, but not CPA firms."). She also testified that her role in building relationships with CPA firms was separate from her role developing relationships with end clients. *Id.* at 196. Miller stated that until 2018, when she became a non-equity partner of HKFS, her compensation was tied to how many end clients and revenue from those clients she brought in, not her relationships with CPA firms. *Id.* Miller's testimony is consistent with Cose's. While CPA firms and their clients are both crucial pieces of HKFS's business model, Miller did not specifically testify that HKFS employees never use the term "client" to refer to CPA firms.

HKFS did not show that they are likely to succeed on the merits of showing that CPA firms are "clients" under the meaning of the Ancillary Agreement. The position description and testimony of the parties likely show that "clients" refers to end clients of HKFS, not CPA firm affiliates. Thus, the court considers the non-solicitation agreement in the Ancillary Agreement only as it applies to end clients of HKFS, and not to CPA firms with whom HKFS partners.

### B.   Whether the Ancillary Agreement's Non-Solicitation Provision Prohibits Miller from Accepting Business from HKFS's Clients and is Enforceable against Miller

Under Iowa law, courts will generally "enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest." *Curtis 1000, Inc. v.*

*Youngblade*, 878 F. Supp. 1224, 1257-58 (N.D. Iowa 1995) (quoting *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983)). "This two-part enforceability test is in essence a reasonableness standard which requires the court to maintain a proper balance between the interests of the employer and the employee." *Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056, 1064 (N.D. Iowa 1996).

> The reasonableness of the necessity to enforce a covenant to protect an employer's legitimate business interest depends on a variety of factors, including an employee's close proximity to customers and access to peculiar knowledge gained through employment that provides a means to pirate the customer, the nature of the business to be protected and the occupation restrained, the employees' access to information peculiar to the employer's business, the opportunity to take some part of the employer's goodwill, the reasonable expectation that some of the employer's customers will follow the employee to the new employment, and general matters of basic fairness.

*Id.*

"Iowa courts routinely find reasonable" restrictions that "prohibit[] sales to customers that [employees] dealt with during their last year" with the company seeking to enforce the covenant. *Id.* (citing *Curtis 1000,* 878 F.Supp. at 1269 (citing Iowa appellate courts' interpretations of Iowa law)); *see also Farm Bureau Serv. Co. of Maynard v. Kohls*, 203 N.W.2d 209, 212 (Iowa 1972) (restricting former employee's activity competitive to the employer for two years in the six townships where the former employee had actually worked for the employer); *Orkin Exterminating Co. v. Burnett*, 146 N.W.2d 320, 327 (Iowa 1966) (restricting former employee from "engaging directly or indirectly in the same or similar or competitive line of business" or from "in any way, directly or

19

indirectly, taking away any of the company's business or customers" in any area where the employee worked for the employer, for a period of three years after employment ended).

The Ancillary Agreement's non-solicitation provision restricts Miller, for two years after her employment, from soliciting, accepting, or diverting any client or account of HKFS with whom Miller has had any contact as a result of her employment. Docket 10-3 ¶ 2(a). HKFS presented evidence that the non-solicitation provision is "reasonable" considering its interests and Miller's interest. First, HKFS showed that Miller had extensive access to information exclusive to HKFS's business. Cose testified that HKFS uses proprietary strategies for attracting and maintaining the clients of CPA firms as HKFS clients. Docket 50 at 11. Miller had access to HKFS's customer relationship management system, which would have given her detailed information about HKFS's clients. *Id.* at 16-17. That information would be of great value to HKFS's competitors and would give those competitors an unfair advantage in the marketplace.

Furthermore, Miller's role as a close contact for her clients on behalf of HKFS makes it more reasonable for HKFS to subsequently restrict her ability to do business with them after she departs. Miller maintained relationships with clients as she sold services and products HKFS developed. She used tools and strategies HKFS provided to her to develop those relationships. And Miller's personal familiarity with the clients she serviced on behalf of HKFS gives her an unfair advantage in maintaining those clients' business on behalf of another

company. Thus, it is not unreasonable that Miller be restricted from doing business with those clients for a defined period after leaving HKFS.

Miller relies on *Farm Bureau Life Ins. Co. v. Dolly*, 910 N.W.2d 196, 200 (S.D. 2018) for her assertion that South Dakota law does not permit restrictive covenants that prohibit acceptance of business. Docket 18 at 15-16.  The court determined that Iowa law applies to the contract, and thus, does not consider *Dolly*, a South Dakota case, as binding law. *Dolly* is, however, instructive in determining whether a prohibition on accepting business contravenes South Dakota public policy.

In *Dolly*, the defendant was a captive insurance agent—"an independent contractor limited to selling insurance and financial products produced or approved by Farm Bureau." 910 N.W.2d at 197. The defendant violated an employment contract with Farm Bureau that restricted him from "sell[ing] nor solicit[ing], directly or indirectly, or initiat[ing] replacements or exchanges of any insurance or annuity product, with respect to any policyholder of [the plaintiff-employer]" for 18 months following his employment, within any counties he serviced while employed. *Id.* The court found that the restriction on the insurance agent accepting business from his former clients was an unreasonable restraint. *Id.*

Miller's reliance on *Dolly* is misplaced. There, the court relied on SDCL § 53-9-12, a provision of state law specifically governing contracts between an insurance company and a captive agent. *Id.* at 199. The court analyzed the meaning of the word "solicit" based on an insurance-specific provision of South

Dakota law. *Id.* at 200. The court concluded that restricting only the solicitation of business, and not its acceptance, "balances the interests of an insurance company with the consumer's interest in deciding whether he or she would rather purchase a new policy from a familiar agent or renew a familiar policy with a new agent." *Id.* at 200-01.

Miller does not point to, and the court cannot identify, any extension of the *Dolly* holding beyond the insurance company-captive agent context. Nor is there a reason to extend the holding here. Miller, unlike the defendant-agent in *Dolly*, was an employee of HKFS who managed accounts and solicited customers on behalf of HKFS. HKFS provided Miller resources and proprietary information under the agreement so that she could carry out her role as an employee and non-equity partner at HKFS. Miller was given access to HKFS's clients and was entrusted to grow relationships with them. In *Dolly*, on the other hand, the captive agent sold products of the insurance company on his own behalf as an independent contractor. Thus, the court declines to find that *Dolly* requires a finding that the restrictive covenant at issue violates South Dakota public policy.

The non-solicitation covenant in the Agreement Ancillary, however, is broader than those upheld under Iowa law. In *Moore Business Forms*, the court, citing Iowa law, granted a preliminary injunction to a plaintiff-employer who sought to enforce a restrictive covenant against two defendant-employees. 953 F. Supp. at 1059. The restriction forbade the defendants from accepting sales from customers with whom the defendants dealt during their last year

22

with the employer for two years following termination of their employment. *Id.* at 1065. The *Farm Bureau Service Co.* court narrowed the original restrictive covenant, which initially applied to the entire sales territory of the company, to only the six townships where the employee worked while employed. 203 N.W.2d at 210. In *Orkin,* the covenant before the court restricted the employee from working with any client only in the geographic area where he worked while employed. 146 N.W.2d at 327. Unlike those restrictions, the Agreement Ancillary prohibits Miller from conducting any business with "any client" with whom Miller "has had any contact as a result of [her] employment" at any time before or after the execution of the Ancillary Agreement. Docket 10-3 ¶ 2(a).

HKFS does not point to, nor can the court identify, any instance of an Iowa court upholding a restrictive covenant where the employee is prohibited from doing business with any entity in any jurisdiction with whom the employee had any contact at any time during the employee's employment. Further, HKFS's interest in preventing unfair competition is diminished if Miller were to do business with an individual she had contact with at HKFS years before her departure. It less likely she would remember proprietary information relating to that person and that person would be less likely to have a heightened sense of trust toward Miller. When a restrictive covenant imposes overly stringent restraints, Iowa law favors partial enforcement to the extent reasonably necessary to protect the employer's legitimate interests. *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 371 (Iowa 1971). Thus, the court limits enforcement of the non-solicitation agreement to prohibiting Miller from

directly or indirectly soliciting, accepting, or diverting business from any client of HKFS with whom she had contact within one year prior to her departure from HKFS.

### B.   Whether HKFS is Likely to Succeed on the Merits of its Claim that Miller Violated the Non-Solicitation Provision

HKFS claims that when Miller signed the Ancillary Agreement, she agreed to not accept or solicit business from HKFS clients for two years following the termination of her employment. As discussed above, the Ancillary Agreement constitutes an enforceable promise between Miller and HKFS that Miller would not solicit or accept business from HKFS.

HKFS introduced at least some evidence that Miller reached out to HKFS clients to solicit their business after she left HKFS. HKFS introduced a voicemail from Hoffman, an HKFS client, who stated that Miller had called her to set up a meeting. In that voicemail, Hoffman stated that "Cara called [her] to set up a meeting about . . . this new company that she's with." Docket 38 at 41.

HKFS also showed evidence that Miller intended to solicit the Wolfe clients. An email from Morgan to Miller stated: "We will need to call Stan [Wolfe] tmoro [sic] as well." Docket 39 at 32. This suggests that whether or not Miller reached out to Wolfe initially, Miller and Morgan planned to later reach out to Stan Wolfe. Miller did not provide an alternate explanation for why she would need to reach out to Wolfe after he already knew of her departure from HKFS other than to provide information to solicit him to Mariner.

HKFS also introduced evidence suggesting Miller solicited and accepted business from Brown. Rex Brown is a former HKFS client who moved his account to Mariner after Miller began employment with Mariner. Docket 50-1 at 70. Miller testified that she called Brown shortly after resigning from HKFS. *Id.* According to Miller, she told Brown "some reasons" that she left HKFS, but only after he stated that he wanted to transfer his account to Mariner. *Id.* at 71. Miller testified that she gave him the name of "Mariner Wealth Advisors," but no other information. *Id.* at 72. Miller testified that her notes of the conversation indicated that Brown told her that regardless of where Miller chose to work, Brown would move his accounts with her because he trusted her to "pick a good place." *Id.* at 73. Miller testified that she did not give Brown any information about Mariner or about the reasons she was unhappy with Blucora's acquisition of HKFS. *Id.* at 74. But Miller also stated that Brown may have asked for information about why she left HKFS, but that she could not remember. *Id.* She testified that she did not ask or urge Brown to transfer his account to Mariner. *Id.* at 103. Regardless of whether Miller solicited Brown, it is likely that she accepted his business in violation of the non-solicitation agreement. HKFS has shown a fair chance of prevailing on the merits of its claim that Miller breached the non-solicitation agreement in the Agreement Ancillary when she solicited and accepted business from former HKFS clients.

## II.    Threat of Irreparable Harm

The second *Dataphase* factor is that the movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A movant's failure to demonstrate irreparable harm is sufficient to deny a motion for preliminary injunction. *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (citing *Watkins Inc.*, 346 F.3d at 844). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

"Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002); *see also Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789-90 (8th Cir. 2010) ("We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm."); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987) (finding irreparable harm where "intangible assets such as reputation and goodwill" are at risk).

Here, HKFS has alleged that it has suffered and will likely continue to suffer harm to its goodwill and reputation as a result of Miller's solicitation and acceptance of business. As discussed in the court's first order granting preliminary injunction, numerous clients and at least one CPA firm have

26

already moved their relationships from HKFS to Mariner. The CPA firms are not likely to have the same goodwill toward HKFS and are not likely to refer their clients to HKFS if Miller continues to solicit clients and accept business from HKFS. Thus, HKFS showed it is likely to suffer a loss of goodwill sufficient to establish irreparable injury under the *Dataphase* factors.

## III.     Balance of the Hardships

The third *Dataphase* factor for obtaining a preliminary injunction requires movants to establish that their irreparable harm is greater than the hardship that a preliminary injunction would cause the opposing party. *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000).

Any harm that Miller or Mariner might face is the result of Miller's breach of the contract with HKFS. *See Perfetti Van Melle USA v. Midwest Processing, LLC*, 135 F. Supp. 3d 1015, 1020 (D.S.D. 2015) (finding that a defendant's harm was minor when it only deprived the defendants of "further profit that they [were] not entitled to make[.]"). Thus, the harms to HKFS in the absence of a preliminary injunction outweigh those Miller and Mariner stand to suffer if the injunction is issued.

## IV.     Public Interest

The public interest is the final *Dataphase* factor the court must balance in determining whether a preliminary injunction should be issued. Here, the public interest weighs in favor of protecting proprietary information and trade secrets and enforcing legal non-solicitation agreements. Iowa and South

Dakota law authorizes non-solicitation agreements like the one between HKFS and Miller. Thus, public policy favors granting the injunction here.

## V.   Bond

The Federal Rules of Civil Procedure require that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). HKFS posted a preliminary injunction bond following the court's previous preliminary injunction order (Docket 44). Docket 51. The court does not order additional bond.

## CONCLUSION

HKFS showed that it is likely to prevail on the merits of its claim that Miller violated the non-solicitation agreement. The non-solicitation agreement is valid under Iowa and South Dakota law and prohibits both the acceptance and solicitation of HKFS clients. The agreement is overly broad, and thus, the court limits its application to only clients of HKFS with whom Miller had contact within a year prior to termination of her employment. Also, HKFS did not show that the agreement applies to CPAs as well as end clients. Thus, it is

ORDERED that Miller is enjoined from taking action of any character that results in violation of the non-solicitation provisions in the Ancillary Agreements as modified in the above order. Miller shall not, directly or indirectly, solicit, accept, or divert business from, provide or attempt to convert to other methods of using, the same or similar products or services provided by

HKFS, any end client of HKFS with which Miller had any contact as a result of her employment with HKFS within the last year of her employment.

Dated November 13, 2020.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE